**FILED**
At Albuquerque, NM

FEB 7 2025

MITCHELL R. ELFERS
CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | CRIMINAL NO. 25-214 JB |
| Plaintiff, ) | |
| ) | Count 1: 18 U.S.C. § 1962(d): RICO |
| vs. ) | Conspiracy; |
| ) | |
| **JOSHUA MONTANO,** ) | Counts 2 - 6: 18 U.S.C. § 666(a)(1)(B): |
| ) | Receiving a Bribe as an Agent of an |
| Defendant. ) | Organization Receiving Federal Funds; |
| ) | |
| ) | Count 7: 18 U.S.C. § 1951(a): |
| ) | Interference with Commerce by Extortion |
| ) | Under Color of Official Right; |
| ) | |
| ) | Count 8: 18 U.S.C. § 1951(a): |
| ) | Conspiracy to Commit Interference with |
| ) | Commerce by Extortion Under Color of |
| ) | Official Right. |

INFORMATION

The United States Attorney charges:

Introduction

At all times relevant to this Information:

New Mexico Driving While Intoxicated (DWI) Laws

1.      New Mexico has a series of state laws designed to target the unlawful driving of vehicles while under the influence of alcohol or drugs. *See* New Mexico Statutes Annotated (NMSA) 1978, § 66-8-101, *et seq.* (2016). Under New Mexico state law, a person has committed DWI if they operated a vehicle while impaired to the slightest degree, *see* NMSA 1978, § 66-8-102(A) (2016), or with a blood alcohol concentration (BAC) greater than .08, *see* NMSA 1978, § 66-8-102(C). A person has committed aggravated DWI if (1) their BAC is .16 or greater, (2) they caused injury as a result of their unlawful operation of a motor vehicle, or (3) they refused

to submit to blood or breath testing. *See* NMSA 1978, §§ 66-8-102(D), 66-8-107(A). (Collectively, these are referred to as DWI Offenders.)

2. DWI offenses that do not involve injury or death to another are generally misdemeanors, unless the offender has at least three prior DWI convictions (resulting in the next DWI arrest being a state felony). *See* NMSA 1978, § 66-8-102(F)-(K). The range of imprisonment depends on an offender's prior DWI conviction history, but all DWI convictions require payment of associated court fees in addition to potential fines. Additionally, if a person is convicted of DWI, they must have an ignition interlock installed in their vehicle (or in any vehicle driven by them).

3. To initiate a state court misdemeanor DWI offense, the arresting officer either files a criminal complaint immediately following the arrest and takes the offender into custody, *see* New Mexico State Court Rules (NMRA) 7-201, or later files a criminal complaint but seeks a summons from the state court, *see id.*, *see also* NMRA 7-204. If the DWI Offender is hospitalized or otherwise unable to be taken into custody immediately following the DWI incident, the officer may later file the criminal complaint and seek a summons from the court.

4. Prior to March 2022, once the New Mexico state criminal DWI charges were initiated, all parties, including a defendant, were entitled to conduct a pretrial interview (PTI) of all witnesses, including law enforcement officers. *See* NMRA 7-504(1). To arrange the PTI, the parties were required to confer and agree in good faith to arrange a date and location for the PTI. If that was unsuccessful, defense counsel could seek a subpoena from the state court for a PTI. Typically, the initial PTI would be arranged at the law enforcement office and, if the officer did not attend, defense counsel could request a subpoena for the PTI at another location, including the defense attorney's law firm. On March 24, 2022, the New Mexico State Supreme Court entered an order temporarily suspending all PTIs in cases occurring in the Bernalillo County

Metropolitan Court, which included all misdemeanor DWI arrests in Bernalillo County. *See* New Mexico Supreme Court Order NO. 22-8500-016. Because of this, since March 2022, there have not been PTIs for misdemeanor DWI cases that occur in Bernalillo County.

<u>New Mexico Motor Vehicle Division (MVD) Administrative Proceedings</u>

5.  For DWI Offenders with New Mexico driver's licenses, in addition to the criminal case, there is a separate administrative process handled by the New Mexico MVD to determine if the DWI Offender's driver's license should be revoked (the "MVD hearing"). *See* NMSA 1978, § 66-8-111. Under New Mexico state law, the officer must immediately provide the DWI Offender written notice of revocation of the DWI Offender's driver's license and of the right to an administrative hearing. *See id.* at § 66-8-111.1(A). This written notice serves as the offender's temporary license for twenty days or, if the DWI Offender requests an administrative hearing, until after the order is entered following that hearing. *See id.* at § 66-8-111.1(B). If the DWI Offender requests a hearing, an administrative hearing is held, at which the officer must appear and provide testimony that there were "reasonable grounds to believe that the person had been driving a motor vehicle within this state while under the influence of intoxicating liquor or drugs", the DWI Offender was arrested, and the results of the blood or breath test (or refusal). *See id.* at § 66-8-112(F). If the officer does so, the MVD then suspends the DWI Offender's driver's license.

<u>New Mexico DWI Law Enforcement</u>

6.  Multiple policing agencies share in the enforcement of DWI laws within and around the Albuquerque area including, but not limited to, the Albuquerque Police Department (APD), the New Mexico State Police (NMSP), and the Bernalillo County Sheriff's Office (BCSO). Each agency has its own internal guidelines related to officer and deputy conduct and behavior.

3

7. APD has a Personnel Code of Conduct that requires all officers to "act in a manner that is above reproach. This includes avoiding behavior that may cast doubt on their integrity, honesty, moral judgment, or character; that tends to bring discredit to the Department; or that impairs the Department's efficient and effective operation." APD Standard Operating Procedure 1-1-6(A)(1).

8. NMSP has a Standard of Conduct applicable to all commissioned officers, which requires all employees to "conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the department. Conduct unbecoming an employee shall include that which brings the department into disrepute or reflects discredit upon the employee as a member of the department, or that which impairs the operation or efficiency of the department or employee." NMSP Standard of Conduct, New Mexico Administrative Code (NMAC) 10.5.100.8(C). Financial gain by employees is prohibited, and employees, including law enforcements officers, are directed that they shall not "accept gifts, gratuities, bribes, loans or rewards which are intended to influence the employee in the performance of their duties and responsibilities or for tasks performed as part of their duties." NMAC 10.5.100.8(O).

9. BCSO has a Code of Conduct that provides, "Personnel shall conduct themselves both on and off-duty in such a manner as to reflect most favorably on the Department." BCSO Code of Conduct 109-1(F). The Code prohibits conduct that "could bring the Office and/or individual Deputy or employee into disrepute based on actions or behaviors displayed by the employee" and that "impairs the operation or efficiency of the Office." BCSO Code of Conduct 109-1(G).

The Defendant

10. At all times material to this Information, defendant **JOSHUA MONTANO** was a sworn law enforcement officer with APD. **MONTANO** joined APD as a police service aide on

4

August 6, 2005, and became a sworn law enforcement officer in 2008. **MONTANO** was assigned to work in the DWI unit on May 17, 2017.

## Count 1

### RICO Conspiracy

11. The allegations set forth in paragraphs 1 through 10 of this Information are realleged and incorporated herein by reference.

### The Enterprise

12. At all times relevant to this Information, **MONTANO** and other persons and entities known and unknown, constituted an enterprise, as that term is defined in 18 U.S.C. § 1961(4), that is, a group of individuals and entities associated in fact (referred to herein as "the DWI Enterprise"). The DWI Enterprise was engaged in, and its activities affected, interstate commerce. The DWI Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise.

13. The DWI Enterprise was comprised of both persons and a law firm. The law firm was owned by co-conspirator 1. RICARDO MENDEZ worked as an investigator for the law firm. **MONTANO** served as an APD officer and joined the DWI Enterprise in 2017. To develop clients and business for the DWI Enterprise, and for pecuniary gain and other benefits, **MONTANO**, co-conspirator 1, MENDEZ, and other officers and deputies with APD, NMSP, and BCSO (collectively, the Officer Members) conspired to cause dismissal of criminal charges and administrative proceedings against persons arrested for DWI offenses.

### Purposes of the DWI Enterprise

14. The purposes of the DWI Enterprise included, but were not limited to, the following:

5

      a.      To generate, preserve, and protect profits of the DWI Enterprise and its members and associates;

      b.      To develop a referral system from the Officer Members, who would refer new DWI arrests directly to members and associates of the DWI Enterprise so that the DWI Offender could be solicited to retain co-conspirator 1 as an attorney, which would lead to increased profits for members and associates of the DWI Enterprise;

      c.      To grow a client base willing to pay higher legal fees in exchange for the successful resolution of their DWI offense;

      d.      To develop a client referral system based on the illegally obtained dismissals of DWI cases, thereby further promoting the success of the DWI Enterprise;

      e.      To provide free or discounted legal services to law enforcement officers to develop goodwill and encourage the officers' participation in the DWI Enterprise's scheme;

      f.      To protect, preserve, and enhance co-conspirator 1's status and reputation as an attorney, thereby allowing co-conspirator 1 to continue growth of the DWI Enterprise;

      g.      To conceal and protect the criminal activities of the DWI Enterprise and its members and associates from detection, investigation, and prosecution; and

      h.      To enrich the members and associates of the DWI Enterprise.

The Racketeering Conspiracy

15.      From at least in or around 2017 through on or about January 18, 2024, in Bernalillo County, in the District of New Mexico, and elsewhere, the defendant, **JOSHUA MONTANO**, along with others, known and unknown, being persons employed by and associated with the DWI Enterprise, an enterprise which engaged in, and the activities of which affected, interstate commerce, knowingly, unlawfully, and willfully conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the

affairs of the DWI Enterprise through a pattern of racketeering activity, as that term is defined by 18 U.S.C. 1961(1) and (5), consisting of:

    a.    multiple acts involving bribery, chargeable under NMSA 1978, § 30-24-1, 30-24-2, 30-28-1, and 30-28-2; and

    b.    multiple acts indictable under 18 U.S.C. § 1951 (relating to interference with commerce by extortion under color of official right); 18 U.S.C. § 2 (aiding and abetting).

16.    It was part of the conspiracy that **MONTANO** agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the DWI Enterprise.

### Manner and Means of the Racketeering Conspiracy

17.    The manner and means by which the conspirators agreed to conduct and participate in the conduct of the affairs of the DWI Enterprise included, among others, the following:

    a.    As part of the racketeering conspiracy, each member and associate of the DWI Enterprise served a different role designed to manipulate the DWI criminal and administrative proceedings to enrich the DWI Enterprise members and associates and to further the DWI Enterprise.

    b.    Co-conspirator 1, a lawyer, owned a criminal defense law firm located in Albuquerque, New Mexico, that specialized in DWI defense. Co-conspirator 1 used his criminal defense law firm to conduct, conceal, and otherwise assist himself and other members and associates of the DWI Enterprise in their criminal activities. Co-conspirator 1 also appeared at the criminal and administrative settings for cases that were part of the scheme and moved to dismiss the proceedings based on the Officer Members' intentional failures to appear at required PTIs, NVD hearings, and/or trials (collectively referred to as "settings).

c. MENDEZ worked for co-conspirator 1's law firm as an investigator and handled the day-to-day coordination of the scheme. Co-conspirator 1 structured the DWI Enterprise so that MENDEZ was the primary person working directly with the Officer Members.

d. **MONTANO** was an Officer Member in the DWI Enterprise. The Officer Members, including **MONTANO**, participated in the DWI Enterprise by intentionally failing to appear at required criminal and administrative settings associated with the DWI-related arrest, allowing co-conspirator 1 to move to dismiss the proceedings.

e. To execute the scheme, the DWI Enterprise members and associates developed a system for DWI Offenders who retained co-conspirator 1 to coordinate the scheduling of the MVD hearing and criminal settings to ensure that the Officer Member would be able to miss the required settings, which, in turn, allowed co-conspirator 1 to use the Officer Member's failure to appear as a basis to request dismissal of the proceeding (even though co-conspirator 1 was aware that the Officer Member had been paid by co-conspirator 1 and MENDEZ to not appear).

f. The DWI Enterprise targeted DWI Offenders, both aware and unaware of the scheme, who retained co-conspirator 1 as their attorney following their DWI arrests. Co-conspirator 1 and/or MENDEZ consulted with the DWI Offender and strongly encouraged that the attorney retainer fee be paid in cash. When the DWI Offender paid the cash retainer, co-conspirator 1 and MENDEZ were paid cash in addition to their law firm salary. In addition, the Officer Members were often paid in cash but, at times, also received other benefits and things of value, including but not limited to free legal services, gift cards, hotel rooms, and other gifts. MENDEZ typically handled communications with Officer Members to negotiate payment amounts and to arrange meetings to exchange payments. However, on occasion, co-conspirator 1 paid Officer Members directly.

g.  In terms of the payment amount the DWI Enterprise members and associates received, there was generally a set amount, but there were also exceptions depending on various factors, including the circumstances of the DWI arrest, the DWI Offender's criminal history (specifically if the offender was facing felony DWI charges based on their prior DWI convictions), the amount of money the DWI Offender appeared to have, and the DWI Offender's personal relation to DWI Enterprise members and associates.

h.  Co-conspirator 1 also provided free or significantly discounted legal services for the Officer Members and their family members in exchange for the Officer Members' non-appearance at required administrative and criminal settings and to develop goodwill between the Officer Member and other members and associates of the DWI Enterprise.

i.  Once the DWI Offender retained co-conspirator 1, co-conspirator 1, MENDEZ, and the Officer Member would coordinate the Officer Member's non-appearance at required settings on the state criminal case and the MVD administrative proceeding. When the Officer Member failed to appear as arranged, co-conspirator 1 moved to dismiss the criminal case and the MVD proceeding. Because the Officer Member was a necessary witness and because the Officer Member did not appear as required, the case and proceeding would be dismissed. Because the state criminal charges were dismissed, the fines, fees, and interlock requirement that would otherwise have applied to the DWI conviction were not imposed. In addition, the DWI Offender's driver's license was not revoked, allowing the DWI Offender to continue to drive without restriction.

j.  As to state criminal cases prior to March 2022, co-conspirator 1, MENDEZ, and the Officer Member agreed that the Officer Member would not appear at the PTIs (either the initial PTI at the law enforcement office or the subpoenaed PTI). Before March 2022, an officer missing a PTI, or multiple PTIs, typically guaranteed the dismissal of a DWI

case because, once requested by a defendant, officer PTIs became a required part of state court discovery. Dismissal of the state criminal case often occurred as a sanction for the State's discovery violation.

      k.     The suspension of PTIs in misdemeanor DWI cases in March 2022 altered how co-conspirator 1, MENDEZ, and Officer Members worked to guarantee dismissal of state criminal DWI-related offenses. No longer able to manipulate Officer Members' appearances at PTIs, co-conspirator 1, MENDEZ, and the Officer Members agreed that Officer Members would not appear at the criminal DWI motion hearings or trial settings. When the Officer Member failed to appear at court, co-conspirator 1 moved to dismiss the case because a necessary witness for the state would not be present.

      l.     As the scheme evolved over the years, several Officer Members with APD, including **MONTANO**, began referring cases to co-conspirator 1 and MENDEZ to secure and increase payments to themselves and to the DWI Enterprise and to grow the DWI Enterprise. Officer Members retained MVD paperwork and driver's licenses, and then provided them to MENDEZ. Officer Members also provided MENDEZ the DWI Offender's phone number, if obtained as part of the DWI incident. Typically, MENDEZ would reach out to the DWI Offender referred by the Officer Member and alert the DWI Offender that MENDEZ knew about the DWI arrest (even though often this was before any documentation about the arrest was publicly available). MENDEZ arranged a time for the DWI Offender to meet with co-conspirator 1 and/or MENDEZ, typically at co-conspirator 1's law firm. Co-conspirator 1 and/or MENDEZ showed the DWI Offender their driver's license (which had been seized in connection to the DWI arrest). Co-conspirator 1 and/or MENDEZ would then inform the DWI Offender that, if they hired co-conspirator 1 as their attorney, they would not have to worry about the DWI arrest. At times, co-conspirator 1 and/or MENDEZ would guarantee that the DWI criminal case and MVD process

10

would be dismissed. If the DWI Offender did not retain co-conspirator 1 as their lawyer, the Officer Member would typically proceed with the DWI case as required, thereby usually securing a DWI conviction against the DWI Offender.

    m.  While Officer Members of the DWI Enterprise included officers from APD, BCSO, and NMSP, APD had the most Officer Members. To ensure that APD DWI officers were able to keep participating in the scheme over the years, other APD Officers Members who had worked in the DWI unit and were part of the scheme helped recruit and train the next generation of Officer Members. The more senior APD Officer Members helped recruit officers to join the DWI Enterprise, frequently personally introduced them to MENDEZ, and often assured the Officer Member recruit about the success of the DWI Enterprise. More senior APD Officer Members also provided MENDEZ the personal cell phone numbers for the recruits, which allowed MENDEZ direct access to the newly recruited Officer Members. In addition, more senior APD Officer Members told MENDEZ which officers the DWI Enterprise should avoid (meaning which officers were likely to report the DWI Enterprise's criminal activity to internal affairs or other law enforcement authorities). In recent years, at times Officer Members were paid a "referral fee" from MENDEZ and co-conspirator 1 as payment for having recruited another Officer Member to join the DWI Enterprise.

    n.  When MENDEZ met with the recruits to bring them into the DWI Enterprise, MENDEZ often discussed many of the other Officers Members who had been and were part of the DWI Enterprise from the different law enforcement agencies (APD, NMSP, and BCSO). This allowed the recruit to feel more comfortable joining the DWI Enterprise because of the number of senior, and often high-ranking, officers who were also Officer Members. This generational participation, particularly within APD, allowed the DWI Enterprise to take root amongst almost the entire APD DWI unit over a lengthy period of time. The more senior APD

11

Officer Members were also asked by MENDEZ, co-conspirator 1, and/or other Officer Members to use their positions and influence within APD to try to ensure that the Officer Members were not investigated or disciplined in connection with their illegal activity.

        o.      Officer Members would also sometimes discuss with each other the continued success of the DWI Enterprise to ensure that it remained successful, profitable, and undiscovered, thereby allowing the DWI Enterprise to continue undetected.

        p.      Officer Members played an essential role in the DWI Enterprise and racketeering conspiracy. Their cooperation, coordination, and agreement to act, or to failure to act, in exchange for a share of the profits of the DWI Enterprise, enabled co-conspirator 1's clients to avoid criminal and administrative consequences related to their DWI arrests. This allowed co-conspirator 1 and MENDEZ to increase their client business, thereby benefiting the DWI Enterprise as a whole.

        q.      The DWI Enterprise members and associates used cellular telephones to coordinate the operation of the scheme and to conduct the affairs of the DWI Enterprise. The DWI Enterprise members and associates used cellular telephones to confer about new DWI arrests, to discuss whether the DWI Offender would be able to pay the legal fees associated with co-conspirator 1's legal representation, to coordinate the scheduling of the state criminal or MVD settings so that the Officer Member had an excuse to not attend the setting, to coordinate payment to the Officer Member for failing to appear, and for other purposes.

        r.      The DWI Enterprise members and associates also used e-mail accounts to coordinate the operation of the scheme and to conduct the affairs of the DWI Enterprise. The DWI Enterprise members and associates sent and received e-mails to discuss the new DWI-related arrests, to provide paperwork associated with the DWI-related arrest to facilitate co-

conspirator 1 and/or MENDEZ's solicitation to hire co-conspirator 1 as their attorney, and for other purposes.

      s.    The DWI Enterprise members and associates frequently used coded language in their communications to avoid detection and criminal prosecution.

In violation of 18 U.S.C. § 1962(d).

Counts 2 - 6

Bribery

18.    The allegations set forth in paragraphs 1 through 10 of this Information are realleged and incorporated herein by reference.

19.    At all times material this Information, APD was a local government agency of the City of Albuquerque, a local government located within the District of New Mexico.

20.    APD received benefits of more than $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, and insurance during the following one-year periods:

      a.    February 1, 2019, through January 31, 2020;

      b.    February 1, 2020, through January 31, 2021;

      c.    February 1, 2021, through January 31, 2022;

      d.    February 1, 2022, through January 31, 2023; and

      e.    February 1, 2023, through January 31, 2024.

21.    At all times material this Information, **JOSHUA MONTANO** was employed as sworn law enforcement officer with APD and assigned to the DWI unit. As a sworn law enforcement officer with APD, **MONTANO** was an agent of APD.

22.    As a sworn law enforcement officer with APD, **MONTANO** was required to "act in a manner that is above reproach." In his role as a sworn law enforcement officer assigned to APD's DWI Unit, **MONTANO**'s duties included, among other things, cooperating fully in all

aspects of the judicial process, including appearing at court hearings, pretrial interviews and MVD hearings.

## Count 2

23. The allegations set forth in paragraphs 1 through 10, and paragraphs 18 through 22, of this Information are realleged and incorporated herein by reference.

24. Between February 1, 2019, and January 31, 2020, **JOSHUA MONTANO** received and accepted U.S. currency payments and things of value from co-conspirator 1 and RICARDO MENDEZ related to DWI cases for at least three DWI Offenders in a series of transactions involving in excess of $5,000.

25. From in or about February 2019 to in or about January 2020, in Bernalillo County, in the District of New Mexico, the defendant, **JOSHUA MONTANO**, corruptly solicited, demanded, accepted, and agreed to accept a thing of value from a person with the intent to be influenced and rewarded in connection with a transaction and series of transactions involving $5,000 or more.

In violation of 18 U.S.C. § 666(a)(1)(B).

## Count 3

26. The allegations set forth in paragraphs 1 through 10, and paragraphs 18 through 25, of this Information are realleged and incorporated herein by reference.

27. Between February 1, 2020, and January 31, 2021, **JOSHUA MONTANO** received and accepted U.S. currency payments and things of value from co-conspirator 1 and RICARDO MENDEZ related to DWI cases for at least four DWI Offenders in a series of transactions involving in excess of $5,000.

28. From in or about February 2020 to in or about January 2021, in Bernalillo County, in the District of New Mexico, the defendant, **JOSHUA MONTANO**, corruptly

solicited, demanded, accepted, and agreed to accept a thing of value from a person with the intent to be influenced and rewarded in connection with a transaction and series of transactions involving $5,000 or more.

In violation of 18 U.S.C. § 666(a)(1)(B).

## Count 4

29.  The allegations set forth in paragraphs 1 through 10, and paragraphs 18 through 28, of this Information are realleged and incorporated herein by reference.

30.  Between February 1, 2021, and January 31, 2022, **JOSHUA MONTANO** received and accepted U.S. currency payments and things of value from co-conspirator 1 and RICARDO MENDEZ related to DWI cases pending in court for at least seven DWI Offenders in a series of transactions involving in excess of $5,000.

31.  From in or about February 2021 to in or about January 2022, in Bernalillo County, in the District of New Mexico, the defendant, **JOSHUA MONTANO**, corruptly solicited, demanded, accepted, and agreed to accept a thing of value from a person with the intent to be influenced and rewarded in connection with a transaction and series of transactions involving $5,000 or more.

In violation 18 U.S.C. § 666(a)(1)(B).

## Count 5

32.  The allegations set forth in paragraphs 1 through 10, and paragraphs 18 through 31, of this Information are realleged and incorporated herein by reference.

33.  Between February 1, 2022, and January 31, 2023, **JOSHUA MONTANO** received and accepted U.S. currency payments and things of value from co-conspirator 1 and RICARDO MENDEZ related to DWI cases for at least six DWI Offenders in a series of transactions involving in excess of $5,000.

34. From in or about February 2022 to in or about January 2023, in Bernalillo County, in the District of New Mexico, the defendant, **JOSHUA MONTANO**, corruptly solicited, demanded, accepted, and agreed to accept a thing of value from a person with the intent to be influenced and rewarded in connection with a transaction and series of transactions involving $5,000 or more.

In violation of 18 U.S.C. § 666(a)(1)(B).

## Count 6

35. The allegations set forth in paragraphs 1 through 10, and paragraphs 18 through 34, of this Information are realleged and incorporated herein by reference.

36. Between February 1, 2023, and January 31, 2024, **JOSHUA MONTANO** received and accepted U.S. currency payments and things of value from co-conspirator 1 and RICARDO MENDEZ related to DWI cases pending in court for at least four DWI Offenders in a series of transactions involving in excess of $5,000.

37. From in or about February 2023, to in or about January 2024, in Bernalillo County, in the District of New Mexico, the defendant, **JOSHUA MONTANO**, corruptly solicited, demanded, accepted, and agreed to accept a thing of value from a person with the intent to be influenced and rewarded in connection with a transaction and series of transactions involving $5,000 or more.

In violation of 18 U.S.C. § 666(a)(1)(B).

## Interference with Commerce by Extortion Under Color of Official Right

### Count 7

38. The allegations set forth in paragraphs 1 through 10, and paragraphs 18 through 37, of this Information are realleged and incorporated herein by reference.

39. In February 2022, **JOSHUA MONTANO,** a sworn law enforcement officer with APD, arrested J.S. and charged them by criminal complaint with DWI. Co-conspirator 2, a sworn law enforcement officer with APD, referred J.S. to co-conspirator 1's law firm, and J.S. hired co-conspirator 1 to represent them in their DWI case. After J.S. hired co-conspirator 1, **MONTANO** agreed to accept and accepted property in concert with co-conspirator 1 and MENDEZ to which **MONTANO** was not due in his role as a sworn law enforcement officer.

40. The property **MONTANO** agreed to accept and accepted was given to him in exchange for his agreement to act, or to fail to act, in such a way that J.S. would avoid criminal and administrative consequences related to their DWI arrest.

41. J.S. gave the property with consent.

42. All charges related to J.S.'s DWI case were dismissed June 2022.

43. From on or about February 27, 2022, to on or about June 30, 2022, in Bernalillo County, in the District of New Mexico, the defendant, **JOSHUA MONTANO**, knowingly attempted to obstruct, delay, and affect in any way and degree commerce and the movement of articles and commodities in such commerce by extortion, in that the defendant attempted to obtain property consisting of U.S. currency not due **MONTANO** or his office from J.S. with J.S.'s consent, under color of official right.

In violation of 18 U.S.C. § 1951(a).

<u>Conspiracy to Commit Interference with Commerce
by Extortion Under Color of Official Right</u>

<u>Count 8</u>

44.     The allegations set forth in paragraphs 1 through 10, and paragraphs 18 through 43, of this Information are realleged and incorporated herein by reference.

45.     From on or about February 24, 2022, through on or about January 18, 2024, in Bernalillo County, in the District of New Mexico, the defendant, **JOSHUA MONTANO**, unlawfully, knowingly, and intentionally combined, conspired, confederated, agreed, and acted interdependently with other persons to commit an offense defined in 18 U.S.C. § 1951(a), specifically interference with commerce by extortion under color of official right.

<u>Object of the Conspiracy</u>

46.     The object of the conspiracy was for **MONTANO** to arrest DWI Offenders and release them without filing charges so that RICARDO MENDEZ could contact the DWI Offenders and attempt to secure a payment in U.S. currency in exchange for **MONTANO** not filing charges against the DWI Offenders, allowing the DWI Offenders to avoid any criminal or MVD administrative consequences.

<u>Manner and Means of the Conspiracy</u>

47.     The object of the conspiracy was accomplished as follows:

a.      **MONTANO**, in his role as a sworn law enforcement officer with APD's DWI Unit, patrolled the City of Albuquerque and made arrests of drivers who allegedly were intoxicated or impaired.

b.      Instead of charging DWI Offenders in accordance with APD policy, **MONTANO** released DWI Offenders from custody without filing charges. In many instances, **MONTANO** retained the DWI Offenders' driver's licenses.

c. After releasing a DWI offender without charging them, **MONTANO** provided MENDEZ with the DWI Offender's driver's license and/or contact information.

d. MENDEZ then contacted or attempted to contact the DWI Offender. DWI Offenders were asked to pay several thousand dollars in U.S. currency in exchange for **MONTANO** not filing charges against the DWI Offenders.

e. If a DWI Offender paid the amount demanded by MENDEZ, then MENDEZ would pay **MONTANO** in exchange for **MONTANO** not filing charges against the DWI Offender.

In violation of 18 U.S.C. § 1951(a).

ALEXANDER M.M. UBALLEZ
United States Attorney

SHANA B. LONG
KATHERINE L. LEWIS
Assistant United States Attorneys
201 Third Street, Suite 900
Albuquerque, New Mexico 87103
(505) 346-7274